**2021 UT App 70**

# THE UTAH COURT OF APPEALS

HKS ARCHITECTS INC.,
*Appellant,*

*v.*

MSM ENTERPRISES LTD, REAL ESTATE DEVELOPMENT ADVISORS
LLC, R. SCOTT MCQUARRIE, HOWARD BASHFORD, RONDO
FEHLBERG, AND TIMOTHY FORSTROM,
*Appellees.*

Opinion
No. 20200043-CA
Filed July 1, 2021

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 190400965

Craig C. Coburn and Steven H. Bergman,
Attorneys for Appellant

Jared D. Scott, Attorney for Appellees

JUDGE GREGORY K. ORME and authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

ORME, Judge:

¶1 HKS Architects Inc. (HKS) challenges the district court's
dismissal of its complaint against MSM Enterprises, LTD (MSM),
Real Estate Development Advisors, LLC (REDA), R. Scott
McQuarrie, Howard Bashford, Rondo Fehlberg, and Timothy
Forstrom (collectively, Appellees) for failure to state a claim
upon which relief may be granted. We affirm.

BACKGROUND[1]

¶2 In February 2015, Bashford organized 12x12 NW LLC (12x12) "as a single purpose, single member, manager-managed, Utah limited liability company for the avowed purpose of developing property in Utah County." MSM was 12x12's sole member. That same month, 12x12 purchased a plot of land in Utah County on which it planned to construct an office building. The purchase price of over $1,579,000 was above market value and was financed by three promissory notes payable to Sundance Debt Partners, LLC; Jive Communications, Inc. (Jive); and Matthew Peterson, a Jive principal. Other than this highly leveraged property, 12x12 had no other assets. It had no cash, bank accounts, employees, or business license.

¶3 On March 2, 2015, REDA,[2] acting "as agents on behalf of [12x12]," issued a request for qualifications (the RFQ) seeking design and construction management services for the project. The RFQ stated that "[t]he structure is preleased to" Jive, "a growing high-tech company." HKS responded to the RFQ and submitted proposals in April and May 2015, which 12x12 accepted. McQuarrie, the manager of MSM,[3] signed the

---

1. The facts of this case are taken from HKS's complaint, which "we accept . . . as true" in reviewing a motion to dismiss for failure to state a claim. *Erickson v. Canyons School Dist.*, 2020 UT App 91, ¶ 6, 467 P.3d 917 (quotation simplified).

2. Bashford, Fehlberg, Forstrom, and McQuarrie were all members of REDA.

3. McQuarrie was technically the manager of MSM Ventures, the general partner of MSM Enterprises, but for ease of reference, we simply refer to MSM Ventures and MSM Enterprises collectively as MSM.

acceptance form but crossed out the words "By [REDA]" and replaced them with "By 12x12 NW LLC, Manager, R. Scott McQuarrie."

¶4 On June 15, 2015, HKS and 12x12 contracted for HKS to provide design and construction management services. That same day, "a Project 'kick-off' meeting" was held. HKS representatives met with representatives from construction, engineer, and real estate companies, along with Bashford, Fehlberg, McQuarrie, and Forstrom. "At this meeting, 12x12 disclosed that Jive, who had supposedly 'pre-leased' the building, had not, in fact, signed a lease [and] that negotiations were on-going."

¶5 On June 23, Bashford informed HKS that Jive would be signing a lease on the building "within days." On July 7, Bashford emailed HKS stating that they were working on getting money from 12x12's preconstruction funds and requested that HKS forward them an invoice for $39,500, which represented ten percent of HKS's contracted fees. By July 31, HKS, which had yet to be paid, emailed McQuarrie inquiring about the late payment. McQuarrie responded, "[W]e did fix our [line of credit] issues. Checks will be issued at the beginning of next week." On August 3, a check for $39,500 was issued to HKS from the account of BTS Investments, Inc. (BTS).[4]

¶6 On August 5, HKS invoiced REDA and 12x12 in the amount of $124,216.63 for work it performed between July 1 and July 31. Still having not been paid on this invoice, HKS performed further work in September 2015 on the project at 12x12's request, relying on promises of payment from REDA and

---

4. BTS is a Utah corporation that McQuarrie, as its sole shareholder, "used as a clearinghouse to pay debts incurred by his various and multiple business entities."

12x12 and on their assurances that a signed pre-lease for the building would "soon" be in place. At the end of September, "BTS . . . paid REDA $30,000 for unspecified services furnished for the Project"—a payment that was not disclosed to HKS, which had still not been paid.

¶7     In October 2015, Bashford informed HKS that Jive had equity in the project and claimed that problems with Jive were the reason payment to HKS had been delayed. Between November 2015 and January 2016, HKS continued to do work on the project without getting paid and issued three more invoices to REDA and 12x12, submitting the last invoice on January 19, 2016.

¶8     Finally, on March 10, 2016, Jive signed a lease for the property. But on May 31, 12x12 failed to file its annual report with the State, causing its registration as a Utah limited liability company to expire—a fact not disclosed to HKS. In September of that year, Bashford and McQuarrie continued to promise payment to HKS for its services, now totaling $164,000, of which only $39,500 had been paid. McQuarrie emailed HKS, stating, "I'm sorry that you've had to await payment for the remainder of what I owe. Please remain confident that you'll receive compensation for the efforts you've made."

¶9     No further payment ever came, and HKS sued 12x12 on January 13, 2017 (the prior suit). While the prior suit was pending, REDA's registration as a Utah limited liability company expired in February 2017. In its complaint in the prior suit, HKS alleged that 12x12 breached their contract and was unjustly enriched by HKS's unpaid services, and that 12x12 still owed nearly $144,000 for services HKS provided. HKS further claimed more than $50,000 in lost profits, interest, other costs, and attorney fees. In May, after initial disclosures were filed and discovery begun, counsel for 12x12 withdrew and successor counsel did not appear on 12x12's behalf. In July, HKS moved

for summary judgment. 12x12 did not respond, resulting in a judgment of nearly $200,000 in HKS's favor.

¶10    Between August 2017 and March 2019, HKS unsuccessfully sought to collect on the judgment, eventually leading to issuance of a supplemental proceedings bench warrant for McQuarrie as 12x12's manager. On August 28, 2018, McQuarrie appeared as required, and in the ensuing hearing HKS learned the following facts: when REDA and 12x12 issued the RFQ for the project, 12x12 had approximately $1.5 million in assets and $1.5 million in liabilities; 12x12 had never filed a tax return; 12x12 had no capital to fund its operations, did not have any financial reserves to cover potential liabilities, and had no money to pay HKS for its services, instead relying on anticipated funds from a construction loan that never materialized; 12x12 never applied for a construction loan; McQuarrie, Bashford, Fehlberg, and Forstrom owned and operated REDA, which represented 12x12 in all its meetings with various stakeholders on the project; 12x12 controlled a bank account under the name of BTS, which BTS used to pay a total of $132,000 to REDA for work REDA performed on the project.

¶11    In March 2019, HKS moved to amend its pleading in the prior suit to add Appellees as defendants, claiming a breach of implied contract and fraudulent concealment. Appellees opposed the motion under rules 59 and 60 of the Utah Rules of Civil Procedure, arguing that they could not be added to the prior suit because HKS missed the deadline for seeking to alter or amend the judgment. In response, HKS withdrew its motion.

¶12    On June 13, 2019, HKS filed the complaint at issue in this case, asserting three causes of action. Its first claim was one for fraud, alleging that Appellees falsely represented that the office building was pre-leased to Jive, a "growing high-tech company"; a signed lease from Jive would be available soon; 12x12 had acquired preconstruction funds enabling it to pay HKS for its

services; and 12x12 had a line of credit from which it could pay HKS. Its second claim was for breach of a contract implied in law, which was asserted only against REDA.[5] As part of this claim, HKS alleged that REDA requested the work HKS performed and that by performing the work, HKS conferred a value of approximately $142,000 on REDA. HKS's final claim was for fraudulent concealment, in which it alleged that Appellees failed to disclose that 12x12 paid more than market value for the property; 12x12 was a shell entity; 12x12 never filed a tax return; 12x12 lacked a business license; 12x12 had no cash reserves, no bank account, and no capital; the property had been over-leveraged, leaving it with no equity; 12x12 was not the sole owner of the property; there was no tenant who had pre-leased the building; 12x12's sole asset was the over-leveraged property; 12x12 planned to pay HKS by using a construction loan that it had yet to obtain; BTS would be the entity making payments to HKS, not 12x12; in September 2015, 12x12 paid REDA $30,000 through BTS; McQuarrie, Bashford, Fehlberg, and Forstrom were members and managers of REDA; and 12x12 "had no financing for the project" in the form of a preconstruction loan or line of credit.

¶13　In response, Appellees moved for dismissal of the complaint pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, asserting that HKS had failed to state a claim upon which relief could be granted. Specifically, Appellees argued that "the statute of limitation bar[red HKS's] fraud claims

---

5. As part of its second claim, HKS also alleged that a contract implied in fact existed between it and REDA. But on appeal, HKS does not challenge the district court's dismissal of its claim on this basis and challenges only the court's ruling dismissing its second claim on the ground that no contract implied in law existed.

because the alleged misrepresentations and omissions at issue occurred well outside the three year statute of limitations."[6] *See* Utah Code Ann. § 78B-2-305(3) (LexisNexis 2018). Both sides asked the district court to take judicial notice of the record in the prior suit, which it did.[7]

---

6. Appellees also asserted that claim preclusion and the economic loss doctrine barred HKS's complaint. Given our affirmance of the district court's order on other grounds, we have no occasion to consider these alternative rationales Appellees relied on below and reassert on appeal.

7. Ordinarily, district courts may not consider anything outside the complaint when ruling on a defendant's 12(b)(6) motion without first converting it to a motion for summary judgment. *See* Utah R. Civ. P. 12(b)(6) (stating that if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment"). *See also Lind v. Lynch*, 665 P.2d 1276, 1278 (Utah 1983) ("Even where a motion is erroneously characterized as a motion to dismiss, if matters outside the pleadings are presented and not excluded, the motion is properly treated as one for summary judgment."). But, while "a court generally must convert a motion to dismiss to one for summary judgment when the court considers matters outside the pleadings, a court need not do so if it takes judicial notice of its own files and records, as well as facts which are a matter of public record." *Rose v. Utah State Bar*, 471 F. App'x 818, 820 (10th Cir. 2012) (quotation simplified). *See also United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (stating that "within the Rule 12(b)(6) framework, a court may consider matters of public record and facts susceptible to judicial notice" without converting the motion to one for summary judgment). Thus, the district court in this case properly took judicial notice of the filings in the prior case and

(continued…)

¶14 The court granted Appellees' motion to dismiss. Regarding HKS's first claim, for fraud, the court stated that

> the specific facts which [HKS] alleges [Appellees] fraudulently represented . . . are: (1) that the building was pre-leased; (2) that 12x12 had available pre-construction funds and a line of credit which could be used to pay for [HKS's] services; (3) that a signed lease would be available soon; and (4) that 12x12 would pay [HKS] for its services.

The court explained that,

> according to the Complaint, [HKS] learned on June 15, 2015 that the building was not pre-leased. This date is more than three years before the filing of this case, and this claim is therefore barred by the statute of limitations.
>
> As to alleged misrepresentation number 2, . . . the Court concludes that [HKS] was given actual or constructive knowledge that this statement was false on or before March 19, 2016, which was 60 days after [HKS] sent the last in a series of invoices to 12x12, none of which were paid. This failure to pay, after repeated demands by [HKS] and corresponding promises to pay by 12x12, reasonably put [HKS] on notice that 12x12 had no funds to pay [HKS]. Even if there were other conceivable reasons to explain 12x12's failure

(…continued)

relied on that information in its ruling without converting Appellees' motion to one for summary judgment.

> to pay by March 19, 2016, such failure to pay still put [HKS] on notice that something was not right, which should have led [HKS] to inquire about the problem and thereby discover 12x12's lack of funds. Because March 19, 2016 is more than three years before the Complaint was filed in this case, this claim is barred by the statute of limitations and accordingly is dismissed with prejudice.
>
> As to alleged misrepresentation 3 . . . and misrepresentation 4, . . . the Court concludes that these statements are not representations concerning a presently existing material fact, but instead concern future events, and therefore do not constitute valid grounds for a claim of fraud.

¶15 The court then rejected HKS's second claim—for breach of contract implied in law, also known as unjust enrichment—raised only against REDA. It ruled that "even if REDA did somehow receive a benefit from [HKS's] services, and appreciated that benefit, it would not be unjust for REDA to retain that benefit because [HKS's] only legitimate expectation in exchange for providing the services under the Contract with 12x12 was to be compensated by 12x12" and thus, "under any state of facts that could be proved in support of [HKS's] claim, REDA has not been unjustly enriched by [HKS's] actions."

¶16 Regarding HKS's third and final claim, for fraudulent concealment, the district court ruled that under Utah Code section 78B-2-305(3), the three-year statute of limitations barred the claim because

> [HKS] could, and should, have investigated and learned the corporate structure, ownership, history, and financial wherewithal of 12x12. Similarly, [HKS] could, and should, have easily

learned of the publicly recorded encumbrances on the Property, its market value, how much 12x12 paid for it, and whether it had other owners. [HKS] also could, and should, have easily learned the identity of the owners of REDA by merely asking, if it wished to know that information.

The only nondisclosed facts set forth [by HKS] which [HKS] could not have easily discovered itself by diligent inquiry are [that no tenant had pre-leased the building; that HKS would be paid by BTS, not by 12x12; and that BTS paid REDA $30,000 on September 24, 2015.] But according to the Complaint, [the] fact . . . that no tenant had pre-leased the building and . . . that [HKS] would be paid by BTS, not by 12x12, . . . were actually discovered by [HKS], thus giving [HKS] actual, rather than constructive, knowledge, on June 15 and August 3, 2015, respectively. Both of these are more than three years before the Complaint was filed in this case.

As to [the] fact . . . that BTS paid REDA $30,000.00 on September 24, 2015, the Court concludes that [Appellees] had no legal duty to disclose this fact to [HKS], and that this fact therefore fails to state a valid claim for fraudulent nondisclosure.

The court dismissed the complaint with prejudice. HKS appeals.

ISSUE AND STANDARD OF REVIEW

¶17 HKS asserts that the district court erred in granting Appellees' motion to dismiss for failure to state a claim upon which relief can be granted. "The propriety of a trial court's

decision to grant or deny a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure is a question of law that we review for correctness." *Erickson v. Canyons School Dist.*, 2020 UT App 91, ¶ 6, 467 P.3d 917 (quotation simplified). "Dismissal of a complaint is proper only if it is clear from the allegations that the plaintiff would not be entitled to relief under the set of facts alleged or under any facts it could prove to support its claim." *Id.* (quotation simplified). "Accordingly, on review we accept all facts alleged as true, and indulge all reasonable inferences in favor of the plaintiff." *Id.* (quotation simplified).

ANALYSIS

¶18    We begin our analysis with a brief overview of the applicable rules of the Utah Rules of Civil Procedure. We also explain the framework of the statute of limitations that the district court applied to dismiss part of HKS's first claim and the entirety of its third claim. We then evaluate each of HKS's claims against this legal backdrop.

¶19    Although a stricter standard applies to fraud claims, as explained in paragraph 24, "rule 8(a) of the Utah Rules of Civil Procedure sets a liberal standard for complaints, requiring only that a complaint 'contain a short and plain: (1) statement of the claim showing that the party is entitled to relief; and (2) demand for judgment for specified relief.'" *America West Bank Members, LC v. State of Utah*, 2014 UT 49, ¶ 13, 342 P.3d 224 (quoting Utah R. Civ. P. 8(a)). After a complaint has been filed, a defendant may move under rule 12(b)(6) of the Utah Rules of Civil Procedure to have the complaint "dismiss[ed] for failure of the pleading to state a claim upon which relief can be granted." Utah R. Civ. P. 12(b)(6). "A dismissal is a severe measure and should be granted by the trial court only if it is clear that a party is not entitled to relief under any state of facts which could be proved

in support of its claim." *America West*, 2014 UT 49, ¶ 13 (quotation simplified).

¶20 Additionally, the general rule is "that affirmative defenses, which often raise issues outside of the complaint, are not generally appropriately raised in a motion to dismiss under rule 12(b)(6)." *Tucker v. State Farm Mutual Auto. Ins.*, 2002 UT 54, ¶ 7, 53 P.3d 947. But in some cases, "the existence of the affirmative defense may appear within the complaint itself," *id.* ¶ 8, or in other documents of which the district court took judicial notice, *see Rose v. Utah State Bar*, 471 F. App'x 818, 820 (10th Cir. 2012) (holding that a district court may, in the context of a rule 12(b)(6) motion, "take[] judicial notice of its own files and records, as well as facts which are a matter of public record") (quotation simplified). "For example, a complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading. The inclusion of dates in the complaint indicating that the action is untimely renders it subject to dismissal for failure to state a claim." *Tucker*, 2002 UT 54, ¶ 8 (quotation simplified). Thus, "a defendant may raise a statute of limitations defense in a motion to dismiss" so long as "a plaintiff's complaint describes events which establish when a statute of limitations begins to run" and "explicitly set[s] forth the relevant date on which those events occurred." *Id.* ¶ 11. *See also Bivens v. Salt Lake City Corp.*, 2017 UT 67, ¶ 54 n.6, 416 P.3d 338.

¶21 Here, based on the facts in HKS's complaint, including mention of specific relevant dates, Appellees were able to rely on the statute of limitations in their rule 12(b)(6) motion with respect to HKS's fraud and fraudulent concealment claims because "the affirmative defense appear[ed] on the face of the pleading," given that the complaint described events that established when the statute of limitations began to run, thus

"render[ing] it subject to dismissal for failure to state a claim." *See Tucker*, 2002 UT 54, ¶¶ 8, 11 (quotation simplified).

¶22 The applicable statute of limitations for HKS's first and third claims is found in Utah Code section 78B-2-305. It states that "for relief on the ground of fraud or mistake," plaintiffs must bring an action within three years from the time they "discover[ed] . . . the facts constituting the fraud or mistake." Utah Code Ann. § 78B-2-305(3) (LexisNexis 2018). This legislative approach, whereby the statute of limitations does not start to run until the plaintiff discovers the facts constituting the fraud or mistake, is called the "statutory discovery rule." *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 21, 108 P.3d 741. Under the statutory discovery rule, "the statute of limitations would begin running from the date a plaintiff either discovered *or should have* discovered his or her claim." *Id.* ¶ 23 (emphasis added). Plaintiffs are considered to have discovered their cause of action when they have "actual knowledge of the fraud or by reasonable diligence and inquiry should know, the relevant facts of the fraud." *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, ¶ 17, 156 P.3d 806 (quotation simplified). Our Supreme Court has emphasized the importance of diligence in this regard:

> A party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge and . . . is required to make inquiry if his findings would prompt further investigation. In other words, if a party has knowledge of some underlying facts, then that party must reasonably investigate potential causes of action because the limitations period will run.

*Id.* (quotation simplified). But if "a plaintiff alleges that a defendant took affirmative steps to conceal the plaintiff's cause

of action, . . . the plaintiff can avoid the full operation of the discovery rule by making a prima facie showing of fraudulent concealment and then demonstrating that given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier." *Berenda v. Langford*, 914 P.2d 45, 51 (Utah 1996).

¶23    With this analytic framework in mind, we now turn to HKS's claims. At the outset, we deal with HKS's first and third claims for fraud and fraudulent concealment respectively, as they share the same statute-of-limitations arguments. We conclude by addressing HKS's second claim for contract implied in law.

## I. Fraud

¶24    HKS asserts that the district court erred in dismissing its claim for fraud on the grounds that it was barred by the three-year statute of limitations.

> A claim of fraud requires the plaintiff to allege (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either knew to be false or made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was induced to act (9) to that party's injury and damage.

*Robinson v. Robinson*, 2016 UT App 33, ¶ 21, 368 P.3d 105. In an effort to pursue a remedy for non-payment, typically just a matter of contract law, HKS has striven mightily to convert what is essentially a contract claim into a fraud claim in hopes of

securing recovery from others—it having become clear that 12x12 is judgment proof. In doing so, HKS was required to state a claim consistent with the multiple requirements for fraud. *See id.* And by the terms of rule 9(c) of the Utah Rules of Civil Procedure, such a claim is not subject to the usual liberal notice pleading requirement, but rather, "the circumstances constituting fraud" must be pleaded "with particularity." *See* Utah R. Civ. P. 9(c).

¶25    In its fraud claim, HKS alleged four instances[8] in which Appellees fraudulently represented information to it, namely,

---

8. In setting forth its fraud claim in its complaint, HKS alleged, beyond these four facts, that when Appellees issued the RFQ, they did so "knowing[ly]," "but did not disclose," among other things, "that when 12x12 purchased the Property it paid more than the market appraised value for the Property, that 12x12 was not the sole owner of the Property and had needed the financial contributions of other persons and entities to purchase the Property[,]. . . [and that] 12x12 had no other assets, no income, no cash, no investors, no equity, no bank accounts, [and] no employees." The district court did not consider these further allegations in discussing HKS's fraud claim, and on appeal, HKS asserts that the court erred in not considering these other "false and misleading statements" made by Appellees. These other contentions in HKS's complaint, however, were not "statements" made by Appellees but simply facts Appellees knew and did not disclose to HKS. Indeed, HKS acknowledges as much when it claims on appeal that Appellees "failed to disclose" this information. When parties fail to disclose information, they are necessarily not making statements and thus are not misrepresenting anything but are, at most, concealing something. Ultimately, the failure to disclose information is separate and distinct from making fraudulent representations and implicates a different cause of action. *Compare Robinson v.*

(continued…)

(1) that the building had been pre-leased, (2) that 12x12 had preconstruction funds and a line of credit to pay for HKS's services, (3) that a signed lease would be available soon, and (4) that 12x12 would pay for HKS's services. HKS asserted in its complaint that each of these representations, on its own, was sufficient to meet all nine of the elements for a claim of fraud. *See id.* We address each of these representations in turn.

A.    Pre-Lease

¶26    The first contention underlying HKS's fraud complaint is that Appellees misrepresented that the proposed building had been pre-leased. The facts readily apparent from the complaint are that on March 2, 2015, REDA, on behalf of 12x12, issued the RFQ stating that the proposed building had already been pre-leased to a "growing high-tech company" when, in fact, no company had pre-leased the building. But on June 15, 2015, at the "Project kick-off meeting," HKS was informed that no company had pre-leased the proposed building and that negotiations were still ongoing. Thus, on June 15, 2015, HKS "discover[ed] . . . the facts constituting the fraud or mistake," *see* Utah Code Ann. § 78B-2-305(3) (LexisNexis 2018), i.e., it

---

(…continued)
*Robinson*, 2016 UT App 33, ¶ 21, 368 P.3d 105 (stating that "[a] claim of fraud requires the plaintiff to allege . . . that a representation was made"), *with Anderson v. Kriser*, 2011 UT 66, ¶ 22, 266 P.3d 819 (stating that to prove a claim for fraudulent concealment, "a plaintiff must prove . . . that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information *he failed to disclose*, and (3) the nondisclosed information was material") (emphasis added) (quotation otherwise simplified). Thus, the court did not err in limiting its analysis to the four instances discussed in more detail below, and we limit our analysis accordingly.

discovered that Appellees' statement that the building had been pre-leased was false. HKS therefore had three years from that date to bring its claim of fraud on the basis of this misrepresentation, *see id.*, but it did not do so until June 13, 2019—nearly a year after the statute of limitations had expired. Consequently, HKS failed to state a claim upon which relief could be granted with respect to this misrepresentation, *see* Utah R. Civ. P. 12(b)(6), and the district court did not err in dismissing the fraud claim based on the three-year statute of limitations.

B.      Preconstruction Funds and Line of Credit

¶27     HKS's next allegation in support of its fraud claim was that Appellees misrepresented that 12x12 had preconstruction funds and a line of credit to pay for HKS's services when, in fact, it did not. Over the life of the project, HKS sent five invoices to 12x12 between July 2015 and January 2016, totaling over $160,000, but received only one payment in the amount of $39,500 in August 2015 from BTS, not 12x12. On August 5, 2015, HKS sent an invoice for the bulk of the amounts due, over $120,000, which 12x12 never paid, and on January 19, 2016, it sent its final invoice.

¶28     Based on these facts, the district court concluded "that [HKS] was given actual or constructive knowledge" that Appellees' statement that Appellees had preconstruction funds or a line of credit "was false on or before March 19, 2016, which was 60 days after [HKS] sent" its final invoice. The court reasoned as follows:

> This failure to pay, after repeated demands by [HKS] and corresponding promises to pay by 12x12, reasonably put [HKS] on notice that 12x12 had no funds to pay [HKS]. Even if there were other conceivable reasons to explain 12x12's failure to pay by March 19, 2016, such failure to pay still

put [HKS] on notice that something was not right, which should have led [HKS] to inquire[9] about the problem and thereby discover 12x12's lack of funds.

---

9. HKS asserts that the district court ruled that "HKS was on notice of facts sufficient to trigger a duty to inquire, and that duty of inquiry included asking the very Defendants committing fraud to disclose their lack of financing." This is not what the court did. It ruled that these facts put HKS on notice that something was amiss and that it should have "inquired" into the problem. The court was not faulting HKS for not directly asking Appellees whether they were committing fraud but rather for not doing *any* investigation into the line of credit and payment issues when there were red flags suggesting something was amiss. The only point at which the court indicated that HKS should have asked Appellees anything is when it stated that if HKS wanted to know the "identity of the owners of REDA," it could have done so "merely [by] asking [Appellees]." We do not view the district court's analysis as problematic, as the court is referring to typical business information that likely would have been willingly provided, and had it not been, then HKS would have been further alerted to something being amiss and prompted to investigate further. We need not pursue a detailed analysis regarding what avenues of inquiry HKS should have pursued, as it did nothing whatsoever in this regard. But in any event, it seems perfectly reasonable to expect that a vendor who has not been paid as promised, but who has been repeatedly assured that payment will be forthcoming from a loan, will inquire as to the status of the loan application process and ask for copies of applications and the like, and for the name of the loan officer with whom the borrower is dealing—and to then draw an appropriate inference if such straightforward information is not readily produced.

¶29　HKS claims that the payment that came from BTS "was designed to hide the fact that there was no financing or line of credit at all."[10] HKS also claims that Appellees misled HKS and "conceal[ed] the absence of a line [of credit]" by "admitt[ing] certain misleading statements such as the lack of pre-leasing when HKS was retained, while continuing to assert access to a line of credit was imminent after Jive signed a lease in March 2016." Thus, HKS asserts that Appellees "took affirmative steps to conceal [HKS's] cause of action," allowing HKS to "avoid the full operation of the discovery rule" because it has shown that "given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier." *See Berenda v. Langford*, 914 P.2d 45, 51 (Utah 1996).

¶30　But Appellees' actions were not such that "a reasonable plaintiff would not have discovered . . . earlier" that Appellees misrepresented the existence of a line of credit and preconstruction financing." *See id.* While HKS certainly asked Appellees about the payments multiple times and was frustrated in its attempts to gain information from 12x12 in the prior suit due to 12x12's obstructive behavior, this does not negate the red flags that were, or at least should have been, apparent to HKS at the time. Those red flags, clear from the face of the complaint, began at the outset of HKS's involvement with Appellees when HKS received its one and only payment from a then-unknown third party, BTS, and not from 12x12, HKS's customer, which supposedly had ample funding via a line of credit and a preconstruction loan. If 12x12 truly had those funding sources in place, then receiving payment from BTS should have put HKS

10. We do not follow this logic. The fact that the payment would come from another entity tends to confirm that 12x12 did not have funding of its own, whether via a line of credit or otherwise.

on notice of a *potential* problem, as this entity was completely unknown to HKS at that time.[11] Next, HKS continually received hollow promises, starting in July 2015 and continuing until its last invoice in January 2016, that payments would come. And they never did. After submitting its largest invoice for over $120,000 in August 2015, HKS still had not received payment by March 2016, nearly six months later. This is hardly the behavior of an adequately funded entity. HKS also submitted other invoices after this for work it provided and still received no payments from 12x12. The fact that the very first payment HKS received came under questionable circumstances, which was followed by months of unpaid invoices and hollow promises, put HKS on notice at least by March 19, 2016[12]—60 days after the

---

11. This fact alone would not necessarily have put HKS on notice of a potential problem. If this was all that occurred and payments had then continued to come in on time from BTS, no red flags would have arisen. But after HKS received its first and only payment from this previously undisclosed company and then never received another payment from 12x12 or BTS after repeated unpaid invoices and repeated unfulfilled promises for imminent payment, HKS clearly was on notice of potential issues with 12x12's ability to pay, which should have prompted inquiry.

12. HKS claims that it "did not learn of the falsity of these misrepresentations regarding financing or a line of credit until sometime in July or August 2018" and that "[t]his allegation, which is to be accepted as true . . . warrants application of the discovery rule." While "we accept all facts alleged [in HKS's complaint] as true," we only "indulge all *reasonable* inferences in favor of the plaintiff." *See Erickson v. Canyons School Dist.*, 2020 UT App 91, ¶ 6, 467 P.3d 917 (emphasis added) (quotation otherwise simplified). And the facts of the complaint show that HKS could have known, or actually did know, of the falsity of

(continued…)

last invoice was sent, and almost six months after its largest invoice was sent—that something was amiss. Thus, HKS should have inquired more diligently into the problem, which would have led to its discovery that Appellees did not have a construction loan or line of credit in place. *See supra* note 9. Thus, HKS cannot rely on Appellees' behavior to toll the statute of limitations. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 23, 108 P.3d 741 (noting that under the statutory discovery rule, "the statute of limitations would begin running from the date a plaintiff either discovered *or should have* discovered his or her claim") (emphasis added); *Berenda,* 914 P.2d at 51. And the district court did not err in determining, based on these facts, that "[HKS] was given actual or constructive knowledge" that Appellees' statements were false more than three years prior to HKS filing its suit in the present case, thereby barring its claim under the statute of limitations and rendering HKS's claim one on which relief could not be granted.

C.      Signed Lease and Payment to HKS

¶31    The final two misrepresentations identified in the complaint were that a signed lease would soon be available and that Appellees promised to pay HKS. The district court ruled that these statements did not "concern[] a presently existing material fact, but instead concern future events, and therefore do not constitute valid grounds for a claim of fraud."

¶32    We decline to reverse the court's ruling on these misrepresentations because HKS did not challenge this ruling in its opening brief on appeal. *See Allen v. Friel*, 2008 UT 56, ¶ 7, 194

---

(…continued)

these statements by at least March 19, 2016, and thus it is not reasonable to infer, as HKS suggests, that it did not know this information until July or August 2018.

P.3d 903 ("[A]n appellant must allege the lower court committed an error that the appellate court should correct. If an appellant does not challenge a final order of the lower court on appeal, that decision will be placed beyond the reach of further review. If an appellant fails to allege specific errors of the lower court, the appellate court will not seek out errors in the lower court's decision.") (quotation simplified). HKS attempts to grapple with this issue in its reply brief, but "issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered." *Kendall v. Olsen*, 2017 UT 38, ¶ 13, 424 P.3d 12 (quotation simplified).

¶33 In sum, the district court did not err in dismissing HKS's fraud complaint as barred by the statute of limitations with regard to HKS's allegations that Appellees misrepresented that the building was pre-leased and that 12x12 had preconstruction funds and a line of credit to pay for HKS's services. HKS knew or should have known this information more than three years before bringing the current action but failed to take any action within that time frame. We also affirm the court's ruling in dismissing HKS's fraud complaint with regard to HKS's allegation that Appellees misrepresented that a signed lease would be available soon and that they would pay HKS, because on appeal HKS has not properly challenged the court's ruling regarding these facts.

## II. Fraudulent Concealment

¶34 HKS asserts that the district court erred in dismissing its claim for fraudulent concealment on the ground that the statute of limitations barred the claim. To prevail on a claim for fraudulent concealment, also known as fraudulent nondisclosure, "a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information he failed to disclose, and (3) the nondisclosed information was material."

*Anderson v. Kriser*, 2011 UT 66, ¶ 22, 266 P.3d 819 (quotation simplified). Of course, in the context of a dismissal premised on statute of limitations grounds, our focus is not on the ultimate viability of the claim. Rather, our focus, like the district court's, is on those facts that should have prompted the kind of inquiry that is contemplated under the statutory discovery rule. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 23, 108 P.3d 741 (stating that under the statutory discovery rule, "the statute of limitations would begin running from the date a plaintiff either discovered *or should have* discovered his or her claim") (emphasis added).

¶35 HKS's complaint recited fourteen facts showing Appellees' fraudulent concealment that we recite again for ease of discussion: (1) 12x12 paid more than market value for the property; (2) 12x12 was a shell entity; (3) 12x12 never filed a tax return; (4) 12x12 lacked a business license; (5) 12x12 had no cash reserves, no bank account, and no capital; (6) the property had been over-leveraged, leaving it with no equity; (7) 12x12 was not the sole owner of the property; (8) there was no tenant who had pre-leased the building; (9) 12x12's sole asset was the over-leveraged property; (10) 12x12 planned to pay HKS from a construction loan that it had yet to obtain; (11) BTS, not 12x12, would be the entity making payments to HKS; (12) in September 2015, 12x12 paid REDA $30,000 through BTS; (13) McQuarrie, Bashford, Fehlberg, and Forstrom were members and managers of REDA; and (14) 12x12 "had no financing for the project" in the form of a preconstruction loan or line of credit.

¶36 The relevant timeline here is that HKS submitted its proposal in response to the RFQ on April 8, 2015, and entered into a contract with 12x12 on June 15, 2015. HKS then provided 12x12 with services between June 2015 and January 19, 2016, when it sent its last invoice to 12x12. Thus, HKS was actively involved with 12x12 and, relatedly, with Appellees, from April 2015 until January 2016, but it was only paid a small portion of

its fees, with continued promises of full payment. Regarding facts 1–7, 9, and 13, it is clear that HKS "should have discovered [its] claim" regarding those facts during this timeframe. *See id.* These are facts that a sophisticated corporate entity such as HKS would want to know regardless of any red flags, and which it should have discovered as early as January 2016, once it went more than five months without payment of its largest invoice of over $120,000 sent to 12x12 in August 2015. And at the latest, HKS should have discovered these facts by April 2016, nearly three months after HKS sent its last invoice to 12x12, bringing the total unpaid amount to over $140,000. On this point, we agree with the district court that HKS "could, and should, have investigated and learned the corporate structure, ownership, history, and financial wherewithal of 12x12"[13] and "could, and should, have easily learned of the publicly recorded encumbrances on the Property, its market value, how much 12x12 paid for it, and whether it had other owners." HKS also could have learned the identity of the managers and members of

---

13. Specifically regarding fact 5, while this information would not necessarily have been readily available to HKS—and while mere non-payment on its own is not necessarily indicative of misleading information in regard to cash reserves and bank accounts—on the heels of all that had occurred in this case, with no proof of loans, misrepresentation about the building being pre-leased, repeated reassurances after months of non-payment, and the one payment coming from a third party, HKS was on notice of the advisability of conducting further inquiry into 12x12's finances. This inquiry could have been undertaken simply by asking 12x12 for bank account and other records to verify its solvency and for information about the status of its construction loan. And if 12x12 balked at this reasonable request, HKS would be on notice of the likelihood of fraudulent concealment.

REDA simply by inquiring of REDA. If REDA had balked at providing this straightforward information, HKS's growing concern would only have been heightened. And in the event REDA declined to disclose this information, then HKS could have readily obtained it via public records. Thus, HKS is considered to have "discovered" its cause of action in relation to these facts by no later than April 2016 because it had "actual knowledge of the [concealed information] or by reasonable diligence and inquiry should [have] know[n], the relevant facts of the fraud perpetrated against [it]." *See Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, ¶ 17, 156 P.3d 806 (quotation simplified). Therefore, the statute of limitations barred its claim when HKS brought it more than three years later on June 13, 2019.

¶37   HKS asserts that it "exercised reasonable diligence in the face of active concealment" of these facts by Appellees. But as previously discussed, *see supra* notes 9, 13, we do not agree that HKS exercised reasonable diligence even in light of Appellees' behavior. Beyond the facts that could have been discovered via a public records search that Appellees could not have effectively concealed—like the absence of a recorded trust deed securing a construction loan—HKS failed to make reasonable inquiries of Appellees for other information or to take further action in the face of obvious red flags. Thus, when HKS ran into payment problems early on and came to know in July 2015 that Appellees had misrepresented in the RFQ that a company had pre-leased the building, reasonable diligence would dictate that HKS undertake these simple investigations and inquiries to determine 12x12's bonafides.

¶38   Regarding facts 8 and 11, we need not determine whether HKS was diligent and should have known this information because HKS had *actual* knowledge of both facts more than three years before bringing its claim. As we have already determined, *see supra* ¶ 26, HKS knew on June 15, 2015, that the building had

not been pre-leased and therefore had until June 15, 2018, to bring its claim of fraudulent concealment on the basis of this fact, but it chose not to do so. The same is true for fact 11. BTS paid HKS on August 3, 2015, thus giving HKS actual knowledge that BTS, and not 12x12, would be paying HKS. HKS then had until August 3, 2018, to bring a claim alleging this concealment, but it failed to do so. Therefore, the district court properly dismissed HKS's fraudulent concealment claim, insofar as it was based on facts 8 and 11, as barred by the statute of limitations due to HKS having actual knowledge that came more than three years before it filed its claim in the present case on June 13, 2019. *See* Utah Code Ann. § 78B-2-305(3) (LexisNexis 2018).

¶39   Regarding fact 12, we decline to reverse the district court's ruling because HKS does not challenge the court's actual reasoning for dismissing its claim insofar as it turns on that fact. The court observed that, even accepting that Appellees concealed BTS's payment to REDA for $30,000, HKS failed to state a claim upon which relief could be granted because Appellees "had no legal duty to disclose this fact to [HKS]," which is the first prong of the fraudulent concealment test. *See Anderson v. Kriser*, 2011 UT 66, ¶ 22, 266 P.3d 819. HKS has not grappled with this reasoning, and thus we decline to reverse the court's ruling with respect to fact 12. *See Kendall v. Olsen*, 2017 UT 38, ¶ 12, 424 P.3d 12; *Allen v. Friel*, 2008 UT 56, ¶ 7, 194 P.3d 903.

¶40   Concerning fact 14, HKS asserts that "there are no facts alleged in the Complaint, or reasonably inferred from those allegations, that would demonstrate that HKS could have learned of [Appellees'] concealment of the facts that 12x12 had no pre-construction financing [and] had no line of credit . . . before the truth came out in July and August 2018." For the reasons set forth above, *see supra* ¶¶ 27–30, we disagree and hold that HKS's fraudulent concealment claim premised on this fact was either known or should have been known to HKS more than

three years prior to filing its claim in the present case. It thus has failed to state a claim upon which relief can be granted.[14]

### III. Contract Implied in Law

¶41    HKS asserts that the district court erred in ruling that under any of the stated facts in the complaint, HKS could not prove that a contract implied in law existed between it and REDA. A claim for contract implied in law, "also termed quasi-contract[] or unjust enrichment," implicates "a doctrine under which the law will imply a promise to pay for goods or services when there is neither an actual nor an implied contract between the parties." *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 44, 355 P.3d 1000 (quotation simplified). This claim "require[s] the plaintiff to establish that the defendant (1) received a benefit, (2) appreciated or had knowledge of this benefit, and (3) retained the benefit under circumstances that would make it unjust for the defendant to do so." *Id.* ¶ 45

---

14. While the district court did not include fact 14 in its analysis regarding HKS's fraudulent concealment claim, the court did undertake a thorough analysis of what HKS should have known and did know regarding this same information in its analysis of HKS's fraud claim, in the context of Appellees' claimed misrepresentations about the line of credit and preconstruction financing. While fraudulent concealment deals with information a defendant did not disclose and fraud deals with false information a defendant did disclose, the district court's analysis of what HKS should have known regarding the truth about 12x12's line of credit and preconstruction financing holds true for both claims. Thus, the court's analysis regarding HKS's fraud claim, insofar as premised on this fact, can readily be applied here because the context remains the same for both, i.e., whether HKS knew or should have known if 12x12 truly had a line of credit or preconstruction financing.

(quotation simplified). It "does not require a meeting of the minds." *Id.* ¶ 44.

¶42    Under the first prong, to show that a contract implied in law existed or that REDA was unjustly enriched, HKS was required "to establish that [REDA] received a benefit" from HKS. *See id.* ¶ 45. On appeal, HKS has not shown how REDA benefited from work HKS performed. HKS simply states that it "provided architectural services to 12x12" and "that money which should have been paid to HKS for those services was instead paid to REDA." With this bare assertion, HKS does not adequately explain how its action in providing architectural services to 12x12 benefited REDA, which was also providing services to 12x12 on the project, nor why money paid to REDA should instead have been paid to HKS. Essentially, HKS's argument on this point is that when a company hires two companies to do work on a project and pays one but not the other, the unpaid company may bring a claim against the company that was paid.[15] But HKS has not directed us to any case law that supports this proposition, nor do we know of any. In fact, HKS "fails to support [its unjust enrichment] argument with citations to any legal authority" regarding how REDA retained a benefit from the services HKS provided to 12x12, and "[a]ccordingly, with respect to this argument, [HKS] has failed to carry [its] burden of persuasion on appeal." *See State v. Hawkins*, 2016 UT App 9, ¶ 47, 366 P.3d 884. Thus, HKS has not satisfied the first element for a contract implied in law and thus has not stated a claim upon which relief could be granted. Accordingly,

---

15. We acknowledge that 12x12 and REDA were friendly companies with overlapping principals, but the fact remains that REDA was a separate entity from 12x12, and simply because the two companies shared principals does not mean HKS had a superior claim to the payments made by 12x12 to REDA.

we need not consider whether its allegations with respect to the other prongs for an unjust enrichment claim were also flawed. Therefore, the district court properly dismissed this claim.

## CONCLUSION

¶43   The district court did not err in dismissing HKS's three causes of action, pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, for failure to state a claim upon which relief could be granted. The dismissal with prejudice is affirmed.

_____