**2023 UT App 115**

# THE UTAH COURT OF APPEALS

VAL PETERSON INC.,
Appellant,
*v.*
TENNANT METALS PTY. LTD. AND METALCORP GROUP BV,
Appellees.

Opinion
No. 20210732-CA
Filed Septembeer 28, 2023

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 180906137

Trent J. Waddoups, John D. Hanover, and Hannah S.
Goodwin, Attorneys for Appellant

Jonathan O. Hafen, Robert S. Clark, Anna Rotman,
and Grant Jones Attorneys for Appellees

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

LUTHY, Judge:

¶1 This case involves the site of the Geneva Steel mill that once operated in Utah County. Sometime after the mill ceased operations, the site was acquired by Anderson Geneva LLC and Ice Castle Retirement Fund LLC (collectively, Geneva). Geneva then entered into a contract with Val Peterson Inc. (VPI) and Tennant Metals Pty. Ltd. (Tennant), under which VPI agreed to both purchase and remove about two million tons of industrial byproducts that remained on the site so that Geneva could develop the property for other uses and Tennant agreed to guarantee VPI's performance by providing funding for the

project. Separately, Metalcorp Group BV (Metalcorp) guaranteed Tennant's performance.

¶2     After VPI began its removal of the industrial byproducts, Tennant and Metalcorp allegedly failed to provide the promised funding, leaving VPI unable to perform and causing Geneva to terminate the contract. VPI then sued Tennant and Metalcorp (collectively, Defendants), and Defendants moved to dismiss VPI's numerous claims for failure to state a claim upon which relief can be granted.

¶3     The district court granted Defendants' motion and dismissed all of VPI's claims. VPI now appeals. We reverse the dismissal of VPI's breach of contract claims against Tennant, but we otherwise affirm the dismissal of VPI's claims. Accordingly, we remand this case to the district court for further proceedings.

BACKGROUND[1]

*The Facts*

¶4     Geneva owned a decommissioned steel mill site in Utah County. The site contained approximately two million metric tons of industrial byproducts referred to as "Red Sea" and "Black Sea" (the Red Sea byproducts). Geneva wanted to hire someone to undertake the extraction of the Red Sea byproducts (the Geneva project) so that Geneva could develop the land for residential and other uses.

¶5     In August 2011, VPI's president learned of the Geneva project. Shortly thereafter, he was introduced to a general

---

1. "Because this is an appeal of the trial court's grant of a rule 12(b)(6) motion, we accept as true the facts alleged in the complaint and, accordingly, recite the facts as contained therein." *Williams v. Bench*, 2008 UT App 306, n.2, 193 P.3d 640.

manager of Tennant, and the two discussed an arrangement whereby "VPI would extract the [Red Sea byproducts] and move those materials to ports on the West Coast . . . and then Tennant would take possession of the [Red Sea byproducts] for shipment to and sale in China." VPI and Tennant thereafter completed steps to evaluate the likely success of such a venture, including by conducting a feasibility study and a resource-definition study. These studies showed that the Red Sea byproducts "could be removed and sold at a price of $145 per ton for delivery in China," that this would result in a gross value of over $136 million, and that "the cost to ship the [Red Sea byproducts] to China would be $86 per ton."

¶6      On April 24, 2012, VPI, Tennant, and Geneva entered into an agreement entitled "Contract for Purchase of Iron Byproducts" (the Purchase Contract). Under the Purchase Contract, Geneva agreed to sell the Red Sea byproducts for $5 per ton and VPI agreed to "purchase and remove" all of the Red Sea byproducts. The Purchase Contract was lengthy and detailed, not only setting forth the terms related to the financial aspects of the sale but also specifying a number of requirements related to the removal itself, such as recognizing that "time is of the essence" and that Geneva needed the Red Sea byproducts removed "as soon as possible to facilitate development of the [p]roperty"; granting a limited license to use the property during the removal process; and setting benchmarks and deadlines for the removal.

¶7      As a signatory to the Purchase Contract, Tennant "absolutely and unconditionally guarantee[d] to [Geneva] the payment and financial performance by [VPI] of all of its duties and obligations under [the Purchase Contract]" and "guarantee[d] the full and faithful payment and financial performance by [VPI]." Additionally, Metalcorp, Tennant's parent company, executed an Acknowledgment and Guarantee (the Guarantee), by which it guaranteed to Geneva the performance of Tennant's obligations under the Purchase

Contract. Thus, Tennant guaranteed the performance of VPI, and Metalcorp guaranteed the performance of Tennant.

¶8    VPI and Tennant also executed a Memorandum of Understanding (the MOU). The MOU said that it was to "serve[] as an [a]greement for the execution of work associated with the purchase and removal of [the Red Sea byproducts] from [Geneva] . . . and [the sale] and delivery of [the Red Sea byproducts] to what is anticipated to be predominantly Asian based customers." The MOU specified the portions of the Geneva project for which each party would be responsible. It also purported to "create a Joint Venture between Tennant and VPI, whereby VPI [would] receive a twenty percent interest (20%) of Tennant's net share of profits arising from [the Geneva project]." Further, the MOU spoke to future events, referencing "a strategic relationship between the [p]arties" wherein they would offer each other the first rights of refusal on future projects, and discussing an anticipated "Participation Agreement" that the parties would enter into, "some key terms" of which were listed in the MOU.[2]

¶9    VPI commenced performance of its obligations under the Purchase Contract in late July 2012, "including but not limited to

---

2. Two additional defendants not mentioned previously came into play at this stage: Horus Capital Incorporated and Metal Extraction Corporation, which is a joint venture of Tennant and Horus Capital Incorporated. Metal Extraction Corporation was created during this same general timeframe, allegedly to "lay[] off some of Tennant's financial risk relating to [the Geneva project]." Tennant "assigned its rights and obligations under the Purchase Contract and the MOU" to this joint venture.

All claims against these two additional defendants were dismissed without prejudice under rule 4(b) of the Utah Rules of Civil Procedure due to VPI's failure to timely serve them. Thus, we do not address on appeal any of the claims against these parties.

obtaining all necessary permits for the work, obtaining required insurance coverages, and engaging subcontractors." VPI was able to finance the first six weeks of performance "with its own capital and with payments from [D]efendants," but on or about September 15, 2012, Defendants "failed and refused . . . to meet their obligations to fund VPI's [p]roject performance and provided VPI with no further funding." VPI was therefore unable to meet its obligations under the Purchase Contract, and Geneva terminated the agreement.

*VPI's Causes of Action*

¶10    Nearly six years later, on August 22, 2018, VPI commenced this action against Defendants. Thereafter, VPI twice amended its complaint, the most recent version of which contains nine causes of action.

¶11    VPI's first cause of action contains claims against Tennant for breach of contract. Specifically, VPI alleges that Tennant breached both the Purchase Contract and the MOU by "refus[ing] and/or fail[ing] to fund [the Geneva project] operations and/or [to] perform its other contractual obligations in the Purchase Contract and the MOU."

¶12    VPI's third cause of action[3] contains claims against Metalcorp for breach of contract. VPI alleges that "Metalcorp breached the Purchase Contract and the Guarantee by failing to provide funding to VPI to perform its obligations under the Purchase Contract."

¶13    VPI's fourth cause of action is a third-party beneficiary breach of contract claim against Metalcorp. For this claim, VPI alleges that if "the Purchase Contract and the Guarantee did not create enforceable contractual agreements between [VPI] and

---

3. VPI's second cause of action is solely against Metal Extraction Corporation, and we do not address it. *See supra* note 2.

Metalcorp," then VPI is a third-party beneficiary of the Purchase Contract and of the Guarantee and was damaged when "Metalcorp breached the Purchase Contract and the Guarantee by failing to provide funding to VPI to perform its obligations under the Purchase Contract."

¶14 VPI's fifth cause of action contains breach of fiduciary duty claims against both Defendants. For this claim, VPI alleges that because of the joint venture allegedly created by the MOU, Defendants owed fiduciary duties to VPI, including the duties of good faith and loyalty, and that Defendants breached those duties.

¶15 VPI's sixth, seventh, and eighth causes of action are all equitable claims against both Defendants. The sixth is a claim of unjust enrichment based on the theory of a "contract implied in law." The seventh is a claim of unjust enrichment based on the theory of a "contract implied in fact." The eighth asserts equitable estoppel. For each of these, VPI alleges that if "the Purchase Contract and the Guarantee did not create enforceable contractual agreements between [VPI] and Defendants," then equity should intervene to prevent Defendants "from retaining the benefits they obtained from [VPI]."

¶16 Finally, VPI's ninth cause of action asserts alter ego liability. Specifically, VPI alleges that "there is a unity of interest and ownership such that there is no separation of the corporate personalities of [Tennant and Metalcorp]" and, therefore, that Metalcorp should be "liable for the conduct, actions, liabilities, and any judgments awarded" against Tennant.

*Defendants' Motion to Dismiss*

¶17 Defendants responded to VPI's complaint by filing a motion under rule 12(b)(6) of the Utah Rules of Civil Procedure to dismiss each of VPI's claims against them. In their motion, Defendants argued that all of VPI's claims were barred by

applicable statutes of limitations. They also argued that the MOU was not an enforceable contract, that Metalcorp owed no contractual duties to VPI, that VPI was not a third-party beneficiary of either the Purchase Contract or the Guarantee, that VPI's breach of fiduciary duty claims were barred by the economic loss rule, that VPI's equitable claims were precluded by the existence of valid contracts, and that VPI's alter ego claim is not a stand-alone cause of action.

¶18    VPI opposed the motion and argued that its various causes of action had not, as a matter of law, failed to state claims upon which relief could be granted and that dismissal would be inappropriate.

¶19    The district court held a hearing on the motion to dismiss and issued its ruling about three weeks later. The court ruled in favor of Defendants and dismissed all of VPI's causes of action. The court determined that the majority of VPI's claims were barred by a four-year statute of limitations, that the MOU was not an enforceable contract, that VPI was not a third-party beneficiary of the Purchase Contract or the Guarantee, that the economic loss rule barred VPI's breach of fiduciary duty claims, that VPI's equitable claims were precluded by the existence of valid contracts, and that alter ego is not a stand-alone claim. VPI now appeals.

ISSUES AND STANDARDS OF REVIEW

¶20    VPI contests the district court's dismissal of each of its claims. "When reviewing a rule 12(b)(6) motion to dismiss, we accept the factual allegations in the complaint as true and interpret those facts, and all reasonable inferences drawn therefrom, in a light most favorable to the plaintiff as the nonmoving party." *National Title Agency LLC v. JPMorgan Chase Bank NA*, 2018 UT App 145, ¶ 7, 429 P.3d 758 (cleaned up), *cert. denied*, 432 P.3d 1232 (Utah 2018). "Because the propriety of a

motion to dismiss is a question of law, we review the dismissal for correctness." *Id.* (cleaned up).

ANALYSIS

¶21 "Rule 12(b)(6) concerns the sufficiency of the pleadings, not the underlying merits of a particular case." *Alvarez v. Galetka*, 933 P.2d 987, 989 (Utah 1997). Thus, "a motion to dismiss should be granted only if, assuming the truth of the [factual] allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275 (cleaned up). "The district court is not permitted to consider dueling evidence or make findings on disputed facts." *1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, 2021 UT 15, ¶ 43, 493 P.3d 580. We employ these principles as we address each of VPI's claims on appeal.

I. First Cause of Action

¶22 VPI's first cause of action alleges two breach of contract claims against Tennant: (A) that Tennant breached the Purchase Contract and (B) that Tennant breached the MOU. We address each of these claims in turn.

A.     VPI's Claim Against Tennant for Breach of the Purchase Contract

¶23 VPI argues that the district court erred in dismissing—at this stage of the proceedings—its claim against Tennant for breach of the Purchase Contract as being time-barred by the four-year statute of limitations contained in the Uniform Commercial Code (the UCC). We agree.

¶24 The assertion that a statute of limitations applies to bar a claim is an affirmative defense. *Barnard & Burk Group, Inc. v. Labor*

*Comm'n*, 2005 UT App 401, ¶ 6, 122 P.3d 700. Because affirmative defenses "often raise issues outside of the complaint, [they] are not generally appropriately raised in a motion to dismiss under rule 12(b)(6)." *Tucker v. State Farm Mutual Auto. Ins. Co.*, 2002 UT 54, ¶ 7, 53 P.3d 947. But if "the existence of the affirmative defense . . . appear[s] within the complaint itself"—"for example, a complaint showing that the statute of limitations has run on the claim"—then "a motion to dismiss under rule 12(b)(6) may raise affirmative defenses." *Id.* ¶ 8 (cleaned up).

¶25　Here, the parties agree, at least for purposes of the motion to dismiss, that VPI's claim against Tennant for breach of the Purchase Contract arose on September 15, 2012, when Tennant allegedly refused to provide additional funding to facilitate VPI's removal of the Red Sea byproducts. And VPI commenced this case nearly six years later, on August 22, 2018. The parties disagree, however, as to which statute of limitations applies to this claim.

¶26　Defendants argue that the Purchase Contract was a contract for the sale of goods—i.e., the sale of the Red Sea byproducts—and, therefore, that the four-year statute of limitations from the UCC applies to any breach of contract claim arising from it. *See* Utah Code § 70A-2-725(1) ("An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued."); *see also id.* § 70A-2-102 ("Unless the context otherwise requires, this chapter applies to transactions in goods . . . ."). VPI, on the other hand, argues that the Purchase Contract is for the provision of services—i.e., the *removal* of the Red Sea byproducts—and, therefore, that the six-year statute of limitations for claims based "upon any contract, obligation, or liability founded upon an instrument in writing" applies. *Id.* § 78B-2-309(1)(b). When faced with these competing arguments, the district court determined that Utah law required it to assess "the primary purpose" of a contract when deciding the

correct statute of limitations and found that "the primary purpose of [the Purchase Contract] was for the sale of goods."

¶27    Despite the parties' contrary contentions, it is clear that the Purchase Contract is an agreement for *both* the sale of goods *and* the provision of services. For such contracts, Utah has "adopted the one-law approach, which applies the UCC to the entire contract if it is predominately a contract for goods" and applies the common law if "the contract is primarily for services." *Salt Lake City Corp. v. Sekisui SPR Ams., LLC*, 482 F. Supp. 3d 1177, 1187–89 (D. Utah 2020); *see also Utah Local Gov't Trust v. Wheeler Mach. Co.*, 2008 UT 84, ¶ 30, 199 P.3d 949 ("If service predominates, and the transfer of title to personal property is only an incidental feature of the transaction, the contract does not fall within the ambit of the UCC." (cleaned up)). Thus, the "predominant purpose test" determines which statute of limitations applies to VPI's claim, and the district court was correct to apply this test.[4] *See Sekisui*, 482 F. Supp. 3d at 1187–89.

---

4. Defendants assert that VPI "failed to preserve its predominant purpose argument" for appeal because it did not raise the issue until the hearing on the motion to dismiss and, even then, did not support the argument with "any analysis of supporting authorities." "The fundamental purpose of the preservation rule is to ensure that the district court had a chance to rule on an issue before an appellate court will address it." *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 42, 361 P.3d 63. Thus, we consider an issue preserved for appeal "when the district court was given notice of the issue . . . and when the court in response to such notice made a specific ruling on the issue." *Pratt v. Nelson*, 2007 UT 41, ¶ 24, 164 P.3d 366. Here, this issue was raised before the district court, the court had time to consider the issue in the several weeks before ruling, and the court ultimately made a specific ruling on the issue. Therefore, this issue is preserved for appeal.

¶28 "To determine the predominant purpose of the [c]ontract, the court first looks to the language of the agreement." *Salt Lake City Corp. v. Southwest Pipeline & Trenchless Corp.*, 561 F. Supp. 3d 1160, 1166 (D. Utah 2021). Here, the parties glean very different purposes from the text of the Purchase Contract. Defendants assert that the Purchase Contract was predominantly (if not solely) for the sale of goods. They point to several factors to support that assertion: (1) the Purchase Contract is titled "Contract for Purchase of Iron Byproducts," (2) the Purchase Contract refers to VPI by the title "Purchaser," (3) the Purchase Contract's terms frequently mention the sale of goods, and (4) the removal tasks assigned to VPI in the Purchase Contract have no specific payment amount associated with them. VPI, on the other hand, asserts that many factors point to the opposite conclusion—that the Purchase Contract is predominantly one for services: (1) the Purchase Contract emphasizes the expeditious removal of *all* the Red Sea byproducts, (2) the Purchase Contract contains benchmarks focused on the mechanism and speed of removing specified quantities of Red Sea byproducts weekly, (3) VPI was to purchase the Red Sea byproducts for $5 per ton when the potential resale value was apparently many times that amount at $145 per ton, (4) the Purchase Contract included a temporary license for VPI to use Geneva's property during removal of the Red Sea byproducts, and (5) the parties were not merchants but, instead, included a real estate developer (which wanted its property cleared for development) and a construction contractor. Clearly, the Purchase Contract can be seen in various lights.

¶29 These differing interpretations based on the text of the Purchase Contract highlight that, while courts must first look to the text of the contract, they must also "consider facts outside of the four corners of the contract to determine its primary purpose, including the circumstances of the contract's negotiation, formation, and performance." *Sekisui*, 482 F. Supp. 3d at 1189. And because the predominant purpose inquiry looks beyond the four corners of the contract, it cannot be resolved on a rule 12(b)(6)

motion when the complaint "do[es] not paint a full picture of the formation and performance of the [contract]." *Id.* This is the situation here. The text of VPI's complaint and the documents attached to it—the only things we may look to when reviewing a dismissal under rule 12(b)(6), *see Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶¶ 9–10, 104 P.3d 1226—did not present the district court with "a full picture" of the Purchase Contract's negotiation, formation, and performance. Thus, a determination of its predominant purpose (and, by extension, the applicable statute of limitations) was inappropriate at this stage of the proceedings. *See Southwest Pipeline*, 561 F. Supp. 3d at 1166.[5]

¶30 This is not to say that the predominant purpose of a hybrid contract cannot in some situations be decided as a matter of law. But if the court needs to look beyond the complaint and documents attached to it to determine the predominant purpose, dismissal under rule 12(b)(6) is improper. These principles are highlighted in two cases discussed in the briefs on appeal. In *Salt Lake City Corp. v. Sekisui SPR Americas, LLC*, 482 F. Supp. 3d 1177 (D. Utah 2020), the court addressed an issue essentially identical to the one before us, that is, whether a "breach of contract crossclaim was governed by the four-year UCC statute of limitations for a claim based on [a] contract for the sale of goods or whether the crossclaim was governed by the six-year statute of limitations for a claim based on a written contract for services."

---

5. For this case, one significant set of facts that is still needed to paint a full picture of the Purchase Contract's negotiation, formation, and performance is more complete information regarding the fair market value of the Red Sea byproducts and, relatedly, whether the $5 per ton price bargained for was a reduced price to offset the value of the byproduct removal. *See Salt Lake City Corp. v. Southwest Pipeline & Trenchless Corp.*, 561 F. Supp. 3d 1160, 1166 (D. Utah 2021) (stating that a consideration in the predominant purpose test is "the cost of the goods and non-goods portions of the contract" (footnote omitted)).

*Id.* at 1186. The court recognized that the predominant purpose test was applicable to the determination but that the test could not be resolved on a rule 12(b)(6) motion because "consider[ing] only the well-pleaded facts of the complaint," "there [was] little factual context concerning the negotiation and formation of the contract." *Id.* at 1188–89. "Perhaps most importantly," neither the cross-complaint nor the contract at issue "state[d] the full cost of the goods sold . . . or the full cost or value of the . . . services provided." *Id.* at 1189. The court concluded that "[w]ithout this key information, [it could not] determine whether goods or services predominate[d] at [that] stage of the proceedings." *Id.*

¶31    The same crossclaim (after having been consolidated with a separate case involving the same parties) was again addressed by the court over a year later in *Salt Lake City Corp. v. Southwest Pipeline & Trenchless Corp.*, 561 F. Supp. 3d 1160 (D. Utah 2021), this time when summary judgment was sought on the statute of limitations issue. *See id.* at 1164. During the intervening year, the parties had submitted affidavits and presumably engaged in other discovery. *See id.* at 1164, 1169. This time, the court first examined the language of the contract and determined that the contract appeared to be predominantly for the sale of goods, *see id.* at 1166–69, but the court also then considered evidence from outside the four corners of the contract to determine whether that evidence "create[d] a genuine dispute of material fact as to the predominant purpose of the contract," *see id.* at 1169–70. When the court determined that the additional evidence did not create a genuine dispute regarding the predominant purpose of the contract, it concluded that the UCC's four-year statute of limitations applied as a matter of law and granted summary judgment on the crossclaim. *See id.* at 1170–71.

¶32    In sum, although the predominant purpose of a contract may, under certain conditions, be determined as a matter of law, when the issue is before a court on a rule 12(b)(6) motion, a determination of the contract's predominant purpose is improper

if the text of the contract and the allegations of the complaint do not present a complete picture of the circumstances surrounding the contract's negotiation, formation, and performance. Because we determine that such a complete picture was not before the district court here, dismissal based on application of the predominant purpose test was inappropriate at this stage of the proceedings. We therefore reverse the district court's dismissal of VPI's claim for Tennant's alleged breach of the Purchase Contract.

B.      VPI's Claim Against Tennant for Breach of the MOU

¶33     The district court also applied the UCC's four-year statute of limitations to VPI's breach of contract claim based on Tennant's alleged breach of the MOU. For the same reasons given in Part I.A, dismissal on this ground was inappropriate at this stage of the proceedings. However, the district court additionally determined that any contract claims based on the MOU should be dismissed for an independent reason: because the MOU is not an enforceable contract but, instead, an unenforceable agreement to agree. VPI contests this alternate ground for dismissal of its claim against Tennant for breach of the MOU. We agree with VPI that dismissal on a rule 12(b)(6) motion was inappropriate under this reasoning as well.

¶34     "To form an enforceable contract, the parties must have a meeting of the minds on the essential terms of the contract." *Bloom Master Inc. v. Bloom Master LLC*, 2019 UT App 63, ¶ 13, 442 P.3d 1178 (cleaned up). "So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a contract." *Id.* (cleaned up). "An agreement to agree at some later date is thus unenforceable." *Id.* ¶ 14.

¶35     The district court's determination that the MOU is an unenforceable agreement to agree was based on the following language in the MOU regarding the parties' intent to enter into a participation agreement in the future: "Tennant has agreed in

principle to go into a 'Participation Agreement' with VPI, some key terms of which are enumerated in this MOU. This participation agreement concerns profit share, risk allocation and funding of the Geneva project." By this language, the parties clearly expressed an intention to enter into some further agreement that would contain the remaining "key terms" regarding the Geneva project. VPI concedes that the MOU contemplates that "further negotiations would occur" regarding the Geneva project, but it argues that "the principal function of the MOU was to create [a] Joint Venture, not to provide an exhaustive plan of action for the Joint Venture's work on the [Geneva] [p]roject." That is, VPI argues that even if the MOU is not an enforceable contract as to all of the rights and responsibilities of the parties regarding the Geneva project, the MOU *is* an enforceable contract to create a joint venture.[6] The

---

6. Defendants argue that this issue was not preserved for appeal. We disagree. In VPI's opposition to the motion to dismiss, it argued that "rather than sell goods, the MOU, by its express terms, 'create[s] a Joint Venture' between Tennant and [VPI]." (First alteration in original.) Further, VPI's counsel addressed the issue at some length during the hearing on the motion to dismiss, stressing that the focus should not be on the MOU language that mentioned a future agreement but, rather, the MOU language that created a joint venture:

> [I]t says, "Shall create a joint venture." It doesn't say, "This is a memorandum of understanding where we might agree to a joint venture." . . . So it's not an agreement to agree. It is saying "We agree that as soon as we sign the bottom line, these parties are creating a joint venture . . . ."

Hence, the issue was "presented to the [district] court in such a way that the [district] court ha[d] an opportunity to rule on that issue," *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968, and the issue was appropriately preserved for our review on appeal.

MOU does certainly purport to create a joint venture between the parties. But this alone is not dispositive of whether a joint venture was actually created by the MOU; instead, such a determination must still assess whether the various required elements of a joint venture are present. *See Betenson v. Call Auto & Equip. Sales, Inc.*, 645 P.2d 684, 686 (Utah 1982) ("Even the use of the words 'joint venture' in a contract will not be found determinative if the elements of a joint venture are missing.").

¶36    "A joint venture is an agreement between two or more persons ordinarily but not necessarily limited to a single transaction for the purpose of making a profit." *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974).

> The requirements for the relationship are not exactly defined, but certain elements are essential: The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be a community of interest in the performance of the common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and unless there is an agreement to the contrary, a duty to share in any losses which may be sustained.

*Id.*; *accord Ellsworth Paulsen Constr. Co. v. 51-SPR-LLC*, 2008 UT 28, ¶ 15, 183 P.3d 248. Thus, to ultimately succeed on its claim regarding the MOU, VPI will need to establish that the parties had reached an agreement on each of the required elements of a joint venture when executing the MOU.

¶37    The MOU does not on its face specifically establish each of the essential elements for a joint venture, but neither does it specifically exclude them or plainly leave them for future determination. Rather, the MOU's language as it relates to this issue suffers from some ambiguity—not being entirely clear as to what exactly was encompassed in the parties' stated agreement to

"create a Joint Venture." It is conceivable that after discovery related to the parties' intentions, extrinsic evidence will show that the parties intended to form a joint venture—including all of its required elements—by their execution of the MOU. *See generally Brady v. Park*, 2019 UT 16, ¶ 29, 445 P.3d 395 ("[I]f a contract term is ambiguous, district courts should consider extrinsic evidence to resolve the ambiguity."). Because VPI alleges an agreement to form a joint venture and a breach of that agreement, and because the terms of the MOU do not specifically preclude or definitively leave for future determination any of the essential elements of a joint venture, it was error for the district court to dismiss—at this stage of the proceedings—VPI's breach of contract claim based on an alleged breach of a joint venture agreement under the rationale of an unenforceable agreement to agree. *See Betenson*, 645 P.2d at 686–87 (holding that "agreements entered into by the plaintiffs and [a defendant] were not joint venture agreements" only after identifying contractual language that "specifically excluded" the possibility of a joint venture). We therefore reverse the district court's dismissal of VPI's claim for Tennant's alleged breach of the joint venture agreement allegedly reflected in the MOU.

## II. Third Cause of Action: VPI's Breach of Contract Claims Against Metalcorp

¶38　In its third cause of action, VPI alleges claims of breach of contract against Metalcorp based on Metalcorp's alleged breach of the Purchase Contract and the Guarantee. The district court dismissed this cause of action based on the above statute of limitations rationale and did not reach Defendants' additional arguments for dismissal of this cause of action. Again, for the reasons discussed above, *see supra* Part I.A, we do not agree with dismissal—at least not at this stage of the proceedings—of this cause of action based on the statute of limitations; nonetheless, we affirm the dismissal of this cause of action based on an alternative ground that is apparent in the record. *See Madsen v. Washington Mutual Bank FSB*, 2008 UT 69, ¶ 26, 199 P.3d 898 ("When

reviewing a decision made on one ground, we have the discretion to affirm the judgment on an alternative ground if it is apparent in the record." (cleaned up)).

¶39 Metalcorp is not a party to the Purchase Contract, which expressly identifies the parties as VPI, Tennant, and Geneva. Moreover, VPI is not a party to the Guarantee. "A guaranty is a separate, independent and collateral contract in which the guarantor undertakes the obligation to pay for debts incurred by, or the performance of some duty by, another person or entity." *CIG Toledo LLC v. NZR Retail of Toledo, Inc.*, 131 N.E.3d 351, 358–59 (Ohio Ct. App. 2019); *accord First Com. Bank, NA v. Walker*, 969 S.W.2d 146, 152 (Ark. 1998) ("A guarantor is one who makes a contract, which is distinct from the principal obligation, to be collaterally liable to the creditor if the principal debtor fails to perform."). The party whose performance is being guaranteed "is not a party to [the] guaranty, and the guarantor is not a party to the principal obligation." *Boxum v. Munce*, 751 N.W.2d 657, 663 (Neb. Ct. App. 2008). Here, Metalcorp is plainly a party to the Guarantee because it is the entity making the promises contained in the Guarantee. Yet because Metalcorp "agrees to absolutely and unconditionally guarantee to [Geneva] . . . all obligations of Tennant as set forth in Section 15 of the [Purchase] Contract" and makes no promise to any other person or entity, Geneva is the only other party to the Guarantee.[7]

---

7. VPI's second amended complaint nevertheless alleges that VPI "is a named party to . . . [the] [G]uarantee." However, because this allegation is at odds with the unambiguous language of the Guarantee, it is a legal conclusion, *see Carrier Brokers, Inc. v. Spanish Trail*, 751 P.2d 258, 261 (Utah Ct. App. 1988) (stating that "interpretation of what we believe is an unambiguous written contract" is a "legal question"), and when ruling on a motion to dismiss, we "need not accept legal conclusions . . . couched as

(continued…)

¶40 Because Metalcorp is not a party to the Purchase Contract and VPI is not a party to the Guarantee, Metalcorp owes VPI no contractual duty, and VPI cannot make out a breach of contract claim against Metalcorp. *See Richards v. Cook*, 2013 UT App 250, ¶ 7, 314 P.3d 1040 ("The elements of a prima facie case for breach of contract are (1) a contract, (2) performance *by the party* seeking recovery, (3) breach of the contract *by the other party*, and (4) damages." (cleaned up) (emphasis added)). Accordingly, we affirm the district court's dismissal of VPI's third cause of action.

### III. Fourth Cause of Action:
### VPI's Third-party Beneficiary Claim Against Metalcorp

¶41 As an alternative to its direct breach of contract claim against Metalcorp, VPI alleges as its fourth cause of action a third-party beneficiary claim for breach of contract against Metalcorp. In this regard, VPI asserts that it was "an intended third-party beneficiary of both [the Purchase Contract and the Guarantee]" and can therefore maintain a claim for breach of those agreements by Metalcorp.

¶42 "Third-party beneficiaries are persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 47, 28 P.3d 669 (cleaned up), *holding modified by Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2010 UT 6, 230 P.3d 1000. The Purchase Contract expressly states that it has no third-party beneficiaries. Moreover, as a party to the Purchase Contract, VPI cannot, by definition, be a third-party beneficiary thereof. *See McCall ex rel. Estate of McCall v. SSC Montgomery S. Haven Operating Co.*, No. 2:14-cv-588-MHT-PWG, 2015 WL 13603823, at *10 (M.D. Ala. Aug. 6, 2015) (holding that a party

---

facts," *Miller v. West Valley City*, 2017 UT App 65, ¶ 12, 397 P.3d 761 (cleaned up), *cert. denied*, 406 P.3d 249 (Utah 2017).

"cannot simultaneously be a party to a contract and a third-party beneficiary"). We are therefore left with only the question of whether VPI is a third-party beneficiary under the Guarantee.

¶43   "For a third party to have enforceable rights under a contract, the intention of the contracting parties to confer a separate and distinct benefit upon the third party must be clear." *SME Indus.*, 2001 UT 54, ¶ 47 (cleaned up). This is a high standard. "It is not enough that the parties to the contract know, expect or even intend that others will benefit from the contract[;] the contract must be undertaken for the plaintiff's direct benefit[,] and the contract itself must affirmatively make this intention clear." *Id.* (cleaned up). There is barely a reference to VPI in the Guarantee, let alone anything from which we may infer a clear intention to confer a distinct benefit upon VPI. The Guarantee expressly intends a benefit to Geneva by guaranteeing Tennant's performance under the Purchase Contract, but there is no indication that benefit to a third party is anticipated. Thus, VPI is not a third-party beneficiary of the Guarantee, and the district court correctly dismissed VPI's fourth cause of action.[8]

IV. Fifth Cause of Action:
VPI's Breach of Fiduciary Duty Claims Against Defendants

¶44   VPI's fifth cause of action contains claims of breach of fiduciary duties by Defendants. The district court dismissed this cause of action based on the economic loss rule. "The economic loss rule prevents recovery of economic damages under a theory of nonintentional tort when a contract covers the subject matter of

---

8. VPI's second amended complaint alleges that VPI is an intended beneficiary of the Guarantee and the Purchase Contract. But this also is an allegation at odds with the unambiguous language of those contracts and is thus an erroneous legal conclusion that we need not accept in reviewing VPI's motion to dismiss. *See supra* note 7.

the dispute." *Reighard v. Yates*, 2012 UT 45, ¶ 20, 285 P.3d 1168. "Thus, when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon." *Id.* (cleaned up).

¶45    VPI does not challenge the court's determination that the economic loss rule bars recovery for breach of fiduciary duties if those duties arise out of the contracts at issue between the parties. Instead, VPI argues that it "has adequately pleaded the required elements of a breach of fiduciary duty claim that exists separate from its contract-based claims." However, even assuming there are fiduciary duties that exist outside the contracts at issue here, such claims for breach of fiduciary duty "are subject to the general four-year statute of limitations." *See National Title Agency LLC v. JPMorgan Chase Bank NA*, 2018 UT App 145, ¶ 16, 429 P.3d 758, *cert. denied*, 432 P.3d 1232 (Utah 2018); *see also* Utah Code § 78B-2-307. And because the alleged breaches of fiduciary duty occurred over four years before this case was filed, claims based on such breaches would be barred by the statute of limitations. We therefore affirm the dismissal of VPI's claims in its fifth cause of action.

### V. Sixth, Seventh, and Eighth Causes of Action: VPI's Equitable Claims Against Defendants

¶46    VPI argues that the district court erred in dismissing its equitable claims of quantum meruit (both contract implied in law and contract implied in fact) and estoppel, challenging the district court's reasoning that such claims were "barred where an express contract governs the issue." However, even assuming that the district court erred in this regard, these equitable claims allegedly arose due to Defendants' non-payment in late 2012 and would therefore have been barred by the four-year catch-all statute of limitations, *see* Utah Code § 78B-2-307, which applies to equitable

actions, *see American Tierra Corp. v. City of West Jordan*, 840 P.2d 757, 761 (Utah 1992) (applying the catch-all statute of limitations to an equitable action after relying on both the "principle that actions in equity frequently are governed by a state's catch-all limitation statute" and "the Utah precedents that have applied our four-year catch-all statute to equitable actions"). We therefore affirm the dismissal of VPI's sixth, seventh, and eighth causes of action.

## VI. Ninth Cause of Action:
### VPI's Alter Ego Claim

¶47　Finally, VPI contests the dismissal of its ninth cause of action, which purports to allege a claim of alter ego liability. VPI argues that its alter ego claim should survive if we determine—as we have—that any other of its claims survive the motion to dismiss. Of course, Defendants are correct that "[a]lter ego theory is not an independent claim for relief; rather, it is a theory of liability." *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 6 n.1, 284 P.3d 630. Therefore, the court rightly dismissed VPI's ninth cause of action as a stand-alone claim. "However, to the extent [VPI] relies on alter ego as a theory for recovery against Defendants under [a] valid cause[] of action, [VPI] is free to amend [its] complaint to put Defendants on notice of recovery based on that theory." *Al-Fouzan v. Activecare, Inc.*, No. 2:15-cv-373-BCW, 2016 WL 1092495, at *5 (D. Utah Mar. 21, 2016).

## CONCLUSION

¶48　The dismissal of VPI's breach of contract claims against Tennant for alleged breaches of the Purchase Contract and the MOU (VPI's first cause of action) was inappropriate at this stage of the proceedings, and we reverse this dismissal. We affirm the dismissal of all other causes of action. However, VPI may amend its complaint to include alter ego as a theory of recovery under its

surviving claims as appropriate. We remand the case to the district court for further proceedings consistent with this opinion.

_____