**2025 UT App 45**

## THE UTAH COURT OF APPEALS

TERRY V. PEARCE AND TONY M. PEARCE,
Appellants,
*v.*
PURPLE INNOVATION, INC.,
Appellee.

Opinion
No. 20240032-CA
Filed April 3, 2025

Fourth District Court, Provo Department
The Honorable Robert C. Lunnen
No. 220401958

Cameron M. Hancock, Justin W. Starr, Michael A.
Eixenberger, Christopher A. Bates, and Hilary R.
Adkins, Attorneys for Appellants

C. Michael Judd and Elena T. Vetter,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     This appeal involves a contract dispute between Terry Pearce and Tony Pearce (the Pearces), who are brothers, and Purple Innovation, Inc. (Purple), a mattress company that the Pearces founded and owned for many years. In February 2018, Purple was acquired by an outside entity. As part of that process, the Pearces each signed an agreement under which they would retain positions within the company and would continue receiving salaries for a period of time. The agreement also entitled them to receive lump-sum payments of their remaining salaries if they left Purple under certain defined circumstances. In August 2020, the Pearces resigned from their positions, and shortly

thereafter, they requested their lump-sum payments. Purple believed that the Pearces' departures did not trigger the lump-sum payment provision, however, so it denied their requests.

¶2      The Pearces sued for breach of contract, but the district court granted Purple's motion to dismiss the complaint. The Pearces now appeal that decision. For the reasons set forth below, we reverse.


BACKGROUND[1]

*The Employment Agreement and the Exchange Agreement*

¶3      The Pearces are co-founders of Purple, a company that manufactures mattresses, pillows, seat cushions, and other products. The Pearces also created and controlled InnoHold, LLC (InnoHold), and InnoHold was the "historic majority and controlling owner" of Purple. While Purple was initially a privately held company, its rapid growth prompted the Pearces to pursue a public offering through merger.

¶4      On February 2, 2018, Global Partner Acquisition Corp. (GPAC) entered into a merger agreement with Purple with plans to take Purple public. Two agreements that were part of that process were signed on that same day, and both end up mattering for this appeal.

¶5      **The Employment Agreement.** First, the Pearces each signed what's been referred to as "the Employment Agreement,"

---

1. "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Willow Creek Assocs. of Grantsville LLC v. Hy Barr Inc.*, 2021 UT App 116, n.1, 501 P.3d 1179 (quotation simplified).

and Purple was the other side to that agreement. Under the Employment Agreement, the Pearces were appointed as Co-Directors of Research and Development for Purple, and they were each provided with certain benefits moving forward. These included $300,000 per year in salary, with that amount increasing by $20,000 per year for a period of four years, renewable for one-year terms thereafter; health benefits; retirement plans; office space at Purple's headquarters; an agreement that the Pearces could work from any location; and an agreement that the Pearces would not be required to work any particular number of hours.

¶6 The Employment Agreement also included a clause stating that if the Pearces' employments were "terminated" "by [the Pearces] with Good Reason," they would each be entitled to "a one-time immediate lump sum of 100% of the remaining [s]alary and benefits" that they would have been paid from the termination date to the end of the relevant employment period.[2] The phrase "Good Reason" was defined in various ways, including the Pearces' "resignation following a Change of Control." The phrase "Change of Control" was then defined in various ways, one of which was "a change in ownership or control of [Purple] . . . effected through . . . any transaction or series of related transactions to which [Purple] is a party in which excess of 50% of [Purple's] voting power is transferred."

¶7 **The Exchange Agreement.** Purple and InnoHold also agreed to what's been referred to in this litigation as "the Exchange Agreement." Under Purple's corporate structure, there were two kinds of stock—Class A stock, which included both

---

2. If the terminations occurred during the initial four-year period, the Pearces would each receive a lump-sum of the remaining salary for that four-year period, but if the termination occurred during a subsequent one-year renewable term, they would each receive a payment for the amount owed for the remainder of the "calendar year in which the Termination Date occurred."

voting rights and economic rights (i.e., the rights to receive dividends and distributions), and Class B stock, which included voting rights but no economic rights. According to the Exchange Agreement, a holder of Class B stock could exchange one "Class B unit" plus "one share of Class B stock" for one share of "Class A stock." It further provided that when a "Class B Holder exercise[ed] its right to an [e]xchange," Purple was required to "take such actions as may be required to ensure that such Class B Holder receives the shares of Class A Stock that such exchanging Class B Holder is entitled to receive in connection with such Exchange." The Exchange Agreement also gave Purple the option of providing the shareholder with a defined cash payment instead of a share of Class A stock.

*The Informal Agreement*

¶8　　At some point after GPAC's acquisition, the Pearces and Purple entered into what the Pearces later referred to in their amended complaint as the "informal agreement." But although the Pearces described this as being an "informal" agreement, they also alleged that this agreement was formal enough that it was presented to and "approved by the Purple board of directors."

¶9　　The informal agreement had to do with the size of Purple's "public float." As explained and alleged in the Pearces' amended complaint, a company's "public float" refers to the number of shares that are available for public trading that are not controlled by insiders, shareholders, or employees. A "stock with a small public float will generally be more volatile than a stock with a large float," because "with fewer shares available, it may be harder to find a buyer or seller," which "results in larger spreads and lower trading volume." Conversely, "[c]ompanies with a large volume of floating stocks are preferred by institutional investors" because "they can buy or sell large numbers of shares without influencing the stock price much."

¶10 After the GPAC merger, "InnoHold held approximately 44,071,318 shares of Class B Stock of Purple, which equated to approximately an eighty-two percent (82%) ownership interest and voting power in Purple." Purple wanted to reduce the number of shares held by the Pearces (through InnoHold) because this would "improve [Purple's] liquidity and float." So Purple accordingly "asked the Pearces to sell their shares (and InnoHold's shares) to increase Purple's public float stock." In the informal agreement, the Pearces agreed to do so.

*The Pearces' Stock Transactions and Subsequent Requests for Lump-Sum Payments*

¶11 But there was a problem. Although the Pearces had "agreed to sell their shares," they "could only legally or price-effectively sell certain amounts each time, *i.e.*, the Pearces could not sell the majority of their Purple stock in one sale." To get around these impediments, the Pearces "agreed to sell their shares through a series of related transactions." These transactions occurred from mid-2019 through mid-2020, and they were accomplished in three groups.

¶12 First, from June through August 2019, the Pearces distributed 2,512,617 shares of Class B stock, which amounted to about 4.7% of the ownership of Purple, to certain Purple employees, and those employees then exchanged those shares for Class A shares, after which they sold them. In the amended complaint, the Pearces later alleged that "Purple orchestrated" these transfers, in particular the "exchange[s]" that were conducted "pursuant to the Exchange Agreement," and they further alleged that the subsequent "sale of these shares to the public" by the employees "increased the publicly tradeable shares of Purple," thereby "benefit[ting]" Purple.

¶13 Second, from November 2019 through June 2020, the Pearces sold 23,907,777 shares of their stock, which amounted to approximately 44.5% of the ownership in Purple. These sales

occurred in a series of transactions that were conducted through two agreements with underwriters, wherein the underwriters agreed to purchase the Pearces' shares at certain prices and then sell those shares to the public. Purple was a party to each of the agreements with the underwriters—its chief executive officer signed both of the underwriting agreements—and the Pearces, through InnoHold, were parties to the underwriting agreements as well. Both underwriting agreements stipulated how many shares each underwriter would receive; how many shares Purple, InnoHold, or the Pearces would sell; as well as the price per share. Both agreements expressly provided that the Pearces would be selling "Class A Common Stock," so to effectuate these transactions, the Pearces exchanged their Class B shares for Class A shares pursuant to the terms of the Exchange Agreement. In their amended complaint, the Pearces alleged that "Purple orchestrated, assisted with, or facilitated" these transactions to increase its "market float."

¶14    Third, in December 2019, InnoHold transferred 900,474 shares of stock, representing around 1.7% ownership in Purple, to a "donor advised fund," which was a charitable investment account. As with the other transactions, "Purple orchestrated, assisted with, or facilitated" this offering to increase its "market float."

¶15    As a combined result of these three groups of transactions, the Pearces' ownership in Purple (through InnoHold) was reduced from approximately 82% to 31%.

¶16    In August 2020, the Pearces resigned from their positions with Purple. In October 2020, they requested lump-sum payments of their remaining salaries, asserting that they were entitled to these payments under the "Good Reason" and "Change of Control" provisions from the Employment Agreement. Purple declined, asserting that these provisions did not apply because the Pearces had sold or distributed their own shares through

"voluntary secondary offerings" and because Purple "was not a party to those sales transactions." (Emphasis omitted.)

*Procedural History*

¶17 The Pearces sued Purple for breach of contract, including a claim for breach of the covenant of good faith and fair dealing. They sought "at least $500,000 in remaining [s]alary owed to each under the Employment Agreement[]," as well as consequential damages, interest, costs, and attorney fees. In the amended complaint that ultimately drove the litigation, the Pearces set forth the allegations described above. Of some note, the Pearces alleged that the three groups of transactions described above were each "dependent upon and subject to the Exchange Agreement, to which Purple was a party," and they further alleged that these transactions were "completed in accordance with" the informal agreement "between the Pearces and Purple to increase float and reduce the Pearces' ownership interest." The Pearces thus alleged that

> Purple was "a party" to a "transaction" or a "series of related transactions" because it was a party to the Exchange Agreement which outlined the terms of the predicate transactions to obtain the shares of Purple, agreed to work with the Pearces/InnoHold to sell their shares to increase float, among other things, entered into agreements with [the underwriters] to sell the newly available Purple shares to institutional investors, and also led the efforts to orchestrate the underwritten offerings.

¶18 Purple later filed a motion to dismiss pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, asserting that under the terms of the Employment Agreement, the Pearces were not entitled to the lump-sum payments because, in relevant part, (1) the series of transactions through which the Pearces sold or distributed their shares were not "related" and (2) Purple was not

a party to the particular transactions in which the Pearces actually sold their shares.

¶19   After briefing and argument, the district court granted Purple's motion. In its written decision, the court concluded that even under the facts alleged by the Pearces in their amended complaint, the Pearces were not entitled to relief. In the court's view, the plain language of the Employment Agreement supported only one "reasonable" interpretation—namely, that the "Change of Control" provision did not apply because Purple was not a "party" to any of the particular transactions through which the Pearces sold or distributed their shares, which the court concluded were unrelated or "collateral" transactions. As part of this decision, the court determined that for purposes of the "Change of Control" provision, the term "party" referred to "the *buyer* or the *seller* (or, in the case of a transfer, the *transferor* and the *transferee*) of the stock at issue." (Emphases in original.) The court accordingly dismissed the Pearces' amended complaint with prejudice.

ISSUE AND STANDARD OF REVIEW

¶20   The Pearces appeal the district court's decision to grant Purple's rule 12(b)(6) motion to dismiss. "The propriety of a trial court's decision to grant or deny a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure is a question of law that we review for correctness." *Muir v. Wasatch Front Waste & Recycling Dist.*, 2024 UT App 48, ¶ 11, 547 P.3d 863 (quotation simplified). In reviewing such a ruling, "we accept all facts alleged as true, and indulge all reasonable inferences in favor of the plaintiff." *Id.* (quotation simplified).

ANALYSIS

¶21    "After a complaint has been filed, a defendant may move under rule 12(b)(6) of the Utah Rules of Civil Procedure to have the complaint dismissed for failure of the pleading to state a claim upon which relief can be granted." *HKS Architects Inc. v. MSM Enters. LTD*, 2021 UT App 70, ¶ 19, 496 P.3d 228 (quotation simplified). Importantly, "rule 12(b)(6) concerns the sufficiency of the pleadings, not the underlying merits of a particular case." *Val Peterson Inc. v. Tennant Metals Pty. Ltd.*, 2023 UT App 115, ¶ 21, 537 P.3d 660 (quotation simplified). A dismissal under rule 12(b)(6) is "a severe measure and should be granted by the trial court only if it is clear that a party is not entitled to relief under any state of facts which could be proved in support of its claim." *HKS Architects*, 2021 UT App 70, ¶ 19 (quotation simplified). In other words, "a motion to dismiss should be granted only if, assuming the truth of the factual allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Val Peterson*, 2023 UT App 115, ¶ 21 (quotation simplified).

¶22    The Pearces' claims turn on the meaning of certain provisions within the Employment Agreement.[3] "When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling." *Elder v. Elder*, 2024 UT App 68, ¶ 17, 550 P.3d 488 (quotation simplified). "If the language within the four corners of the contract is unambiguous, the parties' intentions are

_____

3. The Pearces pleaded causes of action for both "Breach of Contract" and "Breach of the Covenant of Good Faith and Fair Dealing." Purple's motion to dismiss asked the court to dismiss both "claims," but it did not meaningfully differentiate between the two, and the court's ruling dismissed both without differentiation. Neither party has asked us to treat them differently on appeal.

determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Vierig v. Therriault*, 2023 UT App 67, ¶ 13, 532 P.3d 568 (quotation simplified), *cert. denied*, 537 P.3d 1013 (Utah 2023). Our analysis of such questions is "guided by the ordinary and usual meaning of the words," and "when assessing such meaning, we often look to standard, non-legal dictionaries." *Willow Creek Assocs. of Grantsville LLC v. Hy Barr Inc.*, 2021 UT App 116, ¶ 42, 501 P.3d 1179 (quotation simplified).

¶23 The district court concluded that the language at issue was unambiguous. The question of "whether contract language is ambiguous is a question of law," *Ostler v. Department of Public Safety*, 2022 UT App 6, ¶ 32, 505 P.3d 1119 (quotation simplified), and we owe no deference to the court's determination, *see UDAK Props. LLC v. Canyon Creek Com. Center LLC*, 2021 UT App 16, ¶ 13, 482 P.3d 841. This is so because a district court is "in no better position than is this court to interpret" contractual language. *Level 3 Commc'ns, LLC v. Public Service Comm'n*, 2007 UT App 127, ¶ 11, 163 P.3d 652. "A provision of a contract is not rendered ambiguous by the bare existence of competing interpretations of it. Instead, a provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Vierig*, 2023 UT App 67, ¶ 14 (quotation simplified). Simply put, "a contract is ambiguous if the language of the contract is reasonably capable of being understood in more than one sense." *Haynes v. Department of Public Safety*, 2020 UT App 19, ¶ 9, 460 P.3d 565 (quotation simplified). "[A] reasonable interpretation is an interpretation that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Brady v. Park*, 2019 UT 16, ¶ 55, 445 P.3d 395.

¶24 If the language at issue is ambiguous, then the district court should not grant a motion to dismiss. *See Haynes*, 2020 UT App 19,

¶ 12 (holding that because of a "plausible claim of ambiguity" in the language of a settlement agreement, "dismissal under rule 12(b)(6) was premature"). Instead, at that point, "the intent of the parties becomes a question of fact upon which parol evidence of the parties' intentions should be admitted." *Ostler*, 2022 UT App 6, ¶ 31 (quotation simplified); *see also E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, ¶ 21, 336 P.3d 1077 (reversing the district court's grant of summary judgment after finding that the pertinent contract language "seem[ed] to support two or more plausible meanings" (quotation simplified)).

¶25 As discussed above, the Pearces were contractually entitled to lump-sum payments of their remaining salaries if they resigned following a "Change of Control," and the phrase "Change of Control" was then contractually defined as including

> any transaction or series of related transactions to
> which [Purple] is a party in which in excess of 50%
> of [Purple's] voting power is transferred.

¶26 The Employment Agreement did not contain definitions for many of the key terms or phrases from this provision, including "transaction," "series of related transactions," "party," or "in excess of 50% of [Purple's] voting power is transferred." In the litigation below and again on appeal, the parties have presented markedly different interpretations of what these terms and phrases mean and how they function together within this contract.

¶27 Purple's interpretation is straightforward enough. Purple contends that because the provision refers to a transfer of Purple's "voting power" through "any transaction or series of related transactions *to which* [*Purple*] *is a party*," the only transactions that matter are the particular transactions in which the Pearces actually sold or distributed their shares. (Emphasis added.) Purple then contends that in the context of this provision, the term "party" referred to only "the *buyer* or the *seller* (or, in the case of a

transfer, the *transferor* and the *transferee*) of the stock at issue." (Emphases in original.) While acknowledging, as it must, that the provision also incorporates "related transactions," Purple contends that "[t]o be 'related,' transactions need to involve the same or similar parties, need to have been effected by the same instrument (or set of linked instruments), and need to take place in close temporal proximity to one another." Because Purple was not a party to the particular transactions in which the Pearces' shares were sold, Purple claims that the "Change of Control" provision was not triggered. As noted, the district court concluded that this interpretation was the only reasonable one, and it granted Purple's motion to dismiss on this basis.

¶28 But as explained, the district court should have denied the motion if the Pearces' interpretation could not "be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Brady*, 2019 UT 16, ¶ 55. And again, when reviewing their interpretation, we must accept the allegations from their amended complaint as true. *See Val Peterson*, 2023 UT App 115, ¶ 21.

¶29 The Pearces' interpretation essentially operates on two interrelated fronts.

¶30 The first has to do with the term "party." The Pearces stress that under the allegations of the amended complaint, Purple was a party to the informal agreement, which was apparently important enough to warrant approval by Purple's board of directors. The Pearces alleged and now argue that this informal agreement was the very thing that set in motion the entire sequence of transactions through which they sold or distributed their shares. The Pearces also point out that Purple was a party to the Exchange Agreement. As detailed above, they alleged that the Exchange Agreement played a central role in their ability to sell their shares, because it provided the terms by which the Class B

units and shares of Class B stock were exchanged for more marketable shares of Class A stock. And the Pearces further point out that Purple was a party (indeed, a signatory) to the underwriting agreements through which the Pearces actually sold the bulk of their shares.

¶31 Second, the Pearces emphasize the "Change of Control" provision was broad enough to include a "series of *related* transactions." (Emphasis added.) The Pearces point out that in common parlance, the term "related" refers to things that are "connected by reason of an established or discoverable relation."[4] And here, the Pearces again stress the centrality of the informal agreement to their claims. As set forth in the amended complaint, they sold or distributed their shares because of this agreement, and they further alleged that this agreement was initiated at Purple's request. The Pearces also again point out that the Exchange Agreement was at the center of the various sales because (1) it allowed them (or, in some instances, the employees who received the distributions) to convert Class B units and stock into more marketable Class A stock, and (2) in the various transactions, Purple chose to allow the exchanges to go forward, thereby facilitating the sales, as opposed to exercising its rights to simply cash out the Class B shares once the shareholder invoked its rights under the Exchange Agreement.[5] And finally, the Pearces point out that with respect to the sales that were accomplished through the underwriters, Purple itself directly

---

4. *Related*, Merriam-Webster, https://www.merriam-webster.com /dictionary/related [https://perma.cc/3K2V-XD64]; *see also Related*, Black's Law Dictionary (12th ed. 2024) (defining the term "related" to mean "[c]onnected in some way; having relationship to or with something else").

5. Though a touch unclear, it's at least reasonable to infer that this may have been one of the reasons that the informal agreement required approval by Purple's board of directors.

contracted with the underwriters and then played key roles in "orchestrat[ing]" and "facilitat[ing]" the transactions.

¶32    Having considered the matter, we conclude that both sides have put forward reasonable interpretations of the "Change of Control" provision from the Employment Agreement. It could be the case, as Purple contends, that the only thing that mattered for purposes of this provision were the particular transactions in which the shares were actually sold. But the Pearces' interpretation is reasonable too. They've alleged that all of the sales or distributions were initiated pursuant to an express (albeit "informal") agreement with Purple, that all of the sales or distributions were "dependent upon and subject to" particular actions by Purple pursuant to its rights under the Exchange Agreement (an agreement to which Purple was also a party), that a large number of these sales were accomplished through underwriting agreements (agreements to which Purple was also a party), and that Purple "orchestrated" the various transactions. Given the interrelated connections between Purple, its own agreements, its own conduct, and the subsequent sales of the Pearces' shares, the Pearces have put forward a reasonable interpretation of the Employment Agreement under which the "related transactions" provision was satisfied.

¶33    In an attempt to forestall this outcome, Purple argues that the Pearces' interpretation is unreasonable in light of the alleged purpose for the "Change of Control" provision. In Purple's view, this provision was intended to protect the Pearces from outside circumstances that changed Purple's corporate ownership, as opposed to the transactions at issue here, which were within the Pearces' control. We see the point, and it's possible that the evidence might bear this out. But the Pearces dispute that this was actually the purpose behind this provision. And more to the point, the question at this stage is simply whether each side has put forward a "reasonable interpretation" of the contract's language. *Vierig*, 2023 UT App 67, ¶ 14 (quotation simplified). If they have,

"the intent of the parties becomes a question of fact upon which parol evidence of the parties' intentions should be admitted." *Haynes*, 2020 UT App 19, ¶ 11 (quotation simplified).

¶34   For the reasons set forth above, we conclude that the Pearces have put forward a reasonable interpretation of this contract. Because of this, the question of intent and how it should impact the interpretation of this contract is one for which the court should take evidence. The court therefore erred by granting the motion to dismiss.

## CONCLUSION

¶35   We reverse the district court's decision granting Purple's motion to dismiss, and we remand for further proceedings consistent with this opinion.

_____